**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Lawrence v. Dept. of Rehab. & Corr.*, Slip Opinion No. 2026-Ohio-509.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2026-OHIO-509

THE STATE EX REL. LAWRENCE *v.* DEPARTMENT OF REHABILITATION AND CORRECTION, OPERATION SUPPORT CENTER.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Lawrence v. Dept. of Rehab. & Corr.*, Slip Opinion No. 2026-Ohio-509.]**

*Mandamus—Public-records requests—Relator abandoned several requests for public records that he did not argue in support of in brief—Correctional institution prohibited from denying inmate's request for his master file based on the file not being stored at the institution; if Department of Rehabilitation and Correction possesses the master file, it must be produced, subject to redactions permitted by law—Public office established that correction officers' work schedules and posts are security records exempt from production under R.C. 149.433—A public office does not have a duty to create new records to satisfy a public-records request—Limited writ granted, relator's request for statutory damages deferred until public office complies with limited writ, and relator's request for court costs*

*denied.*

(No. 2024-1169—Submitted May 13, 2025—Decided February 18, 2026.)

IN MANDAMUS.

_____

The per curiam opinion below was joined by FISCHER, DEWINE, BRUNNER, DETERS, HAWKINS, and SHANAHAN, JJ. KENNEDY, C.J., concurred in part and dissented in part, with an opinion.

**Per Curiam.**

{¶ 1} In this original action, relator, Corrionne Lawrence, an inmate at Toledo Correctional Institution ("ToCI"), requests a writ of mandamus ordering respondent, the Ohio Department of Rehabilitation and Correction, Operation Support Center ("ODRC"), to provide him with copies of public records that he requested in the summer of 2024. Lawrence also requests statutory damages and court costs. After ODRC filed an answer, we granted an alternative writ and set a schedule for the submission of evidence and briefs. *See* 2024-Ohio-5173.

{¶ 2} For the reasons explained below, we grant a limited writ of mandamus as to one record and deny mandamus relief for Lawrence's other public-records requests. We defer our determination of statutory damages until after ODRC has complied with the limited writ. And we deny Lawrence's request for court costs.

## I. FACTS AND PROCEDURAL HISTORY

### A. Public-Records Requests and Responses

{¶ 3} Between June 19, 2024, and July 11, 2024, Lawrence sent 15 electronic kites to various prison employees and offices.[1]

{¶ 4} On June 19, Lawrence sent a kite to the warden's administrative assistant, who serves as the public information officer for ToCI. In that kite,

_____

1. "A kite is a type of written correspondence between an inmate and prison staff." *State ex rel. Griffin v. Szoke*, 2023-Ohio-3096, ¶ 3.

Lawrence requested a copy of his master file. Officer T. Clark, the backup to the warden's administrative assistant, responded stating that he would check on the request but that he was unsure what would be available to Lawrence. There is no evidence in the record indicating that Clark further responded to this request before Lawrence filed this mandamus action.

{¶ 5} Later on June 19, Lawrence sent a kite to food services requesting a copy of the food-menu schedule for June and July 2024 and a copy of the "contract/policy with Toledo and Aramark." A staff member responded that she would forward the kite to the person who was responsible for putting the menu on inmates' tablets. Although the kite does not contain a notation indicating that the kite was forwarded, the staff member who responded to the kite attests that she forwarded it.

{¶ 6} On June 20, Lawrence sent a kite to the mail room. For the summary of the kite, he wrote: "Affirmative request to be present before legal mail is opened. And a copy of policy regarding Inmates allowance to be present." The kite was marked closed by a mail-room employee, but no response was provided.

{¶ 7} Also on June 20, Lawrence sent a kite to the warden's administrative assistant requesting a copy of the names of all staff members employed at ToCI as correction officers, a staff roster, and the schedule for correction officers employed at ToCI. On June 28, Clark responded that officer schedules "are not releasable per policy," and that there is no available record that contains what Lawrence requested.

{¶ 8} On June 21, Lawrence sent a kite to "Deputy Warden Operations" requesting a copy of the procedure for requesting that new commissary items be added at ToCI's commissary. The deputy warden of operations responded and told him to send a kite to the business office for assistance with the matter. Lawrence then sent a kite to the business office on June 24 with the same request. The business office answered that the commissary carries everything that is allowed at

a level four institution. The response further stated that the business office does not provide copies but that Lawrence should speak to the commissary about obtaining a copy. Lawrence sent the same request to the commissary by kite on June 27. An employee in food services responded to the kite on August 8, informing Lawrence that the commissary carries the items that it is "required by policy to carry." No record was provided with the response.

{¶ 9} Also on June 21, Lawrence sent three kites to the unit manager. In the separate kites, he requested (1) a copy of ToCI's mission statement, (2) a copy of "the proper way to have an attorney's phone number 'white listed' on GTL tablets" and the policy regarding how to schedule a teleconference with an attorney at ToCI, and (3) a copy of the memo or directive governing the decision prohibiting inmates in his unit with his security level from sending videos or pictures using their ViaPath tablets. The unit manager responded to the request for the mission statement by stating that it is posted in the unit. As for the two other requests, the unit manager provided the names of two other staff members who could assist Lawrence with those requests. There is no evidence indicating that Lawrence subsequently requested the respective records from those staff members.

{¶ 10} On June 25, Lawrence sent two kites to the commissary requesting a copy of the rules, policy, and procedure for shopping at the commissary and a copy of a list of items for which the prices had increased from January 2024 to June 2024. A staff member did not respond to the kites until August 7. Regarding his request for the commissary rules, policy, and procedure, the staff member directed Lawrence to contact a person named Copley in the business office. For his request regarding price increases, the staff member responded that the request had already been answered.

{¶ 11} Also on June 25, Lawrence sent a kite to food services requesting a copy of the dietary guidelines for meals served at ToCI from January 2024 to the date of his request. A staff member responded that the "diets are based on the

guidelines of a general heart smart diet." No record was provided with the response.

{¶ 12} On June 30, Lawrence sent a kite to religious services requesting a copy of the policy, procedure, rule, or directive that governs the request for a religious accommodation for a religious diet. Lawrence stated that he had already completed and returned the request-for-accommodation form. He further explained that he had already asked the librarian for the policies but that the librarian had told him that she does not have the policies and had instructed him to contact Chaplain Rupert. In a response provided the same day, Chaplain Rupert confirmed that Lawrence had submitted the forms, provided him with the policy numbers, and welcomed him to look up the policies in the library.

{¶ 13} Lastly, on July 11, Lawrence sent a kite to the warden's administrative assistant requesting a copy of Officer Gross's written conduct-report history from April 2024 to the present (July 11), a copy of disciplinary actions against Officer Gross, and any findings or dispositions related to the disciplinary actions. Derek Burkhart, the warden's administrative assistant, responded on July 16 stating that ToCI does not have a way to search for conduct reports written by Officer Gross.

### B. Procedural History and Partial Production of Records

{¶ 14} Lawrence filed this mandamus action on August 13, 2024. Burkhart attests that upon receipt of the complaint, on or about August 27, he treated the complaint as a public-records request and properly responded to each request. ODRC submitted as evidence an acknowledgment signed by Lawrence that acknowledges receipt of the following information or copies of records:

1. The procedure to request new commissary items is to kite the commissary department.

2. I have been provided with a copy of the legal mail policy 75-MAL-03.

3. I have been provided the pages from the handbook regarding the commissary procedure.

4. Old commissary sheets are not kept as they are updated as prices and supplies change.

5. There is no "master file" at ToCI. T. Clark is the Operational Compliance Manager and back-up to the Warden's Assistance [sic] in his absence.

6. I have been provided a copy of the food service menus.

7. I have been provided with a copy of the Aramark Contract.

8. I have been provided with a copy of the ODRC Mission Statement.

9. I have been provided with the procedure for whitelisting an attorney.

10. I have been provided with a copy of the incarcerated person access to the telephone and electronic mail (Email) policy 76-VIS-02.

The signed acknowledgment is not dated, but both parties agree that Lawrence was provided with the acknowledged records on September 6.

{¶ 15} After ODRC filed its answer on September 13, we granted an alternative writ setting a schedule for the submission of evidence and briefs. *See* 2024-Ohio-5173.

## II. ANALYSIS

{¶ 16} "[U]pon request by any person, a public office or person responsible for public records shall make copies of the requested public record available to the requester at cost and within a reasonable period of time." R.C. 149.43(B)(1). A

writ of mandamus is an appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act. *State ex rel. Wells v. Lakota Local Schools Bd. of Edn.*, 2024-Ohio-3316, ¶ 11; R.C. 149.43(C)(1)(b). To obtain the writ, "the requester must prove by clear and convincing evidence a clear legal right to the record and a corresponding clear legal duty on the part of the respondent to provide it." *State ex rel. Griffin v. Sehlmeyer*, 2021-Ohio-1419, ¶ 10. In general, however, providing the requested records to the relator after the suit has been filed in a public-records mandamus case renders the mandamus claim moot. *State ex rel. Brinkman v. Toledo City School Dist. Bd. of Edn.*, 2024-Ohio-5063, ¶ 25.

{¶ 17} For ease of analysis, we will first discuss the public-records requests that have been rendered moot, then the requests that Lawrence has abandoned, and then the remaining requests—all of which were sent to the warden's administrative assistant.

### A. Lawrence's Claim for a Writ of Mandamus Is Moot Regarding Some Public-Records Requests

{¶ 18} Although ODRC does not concede that all of Lawrence's electronic kites were public-records requests, both parties agree that on September 6, 2024, ODRC provided public records and information responsive to some of Lawrence's kites.

{¶ 19} The evidence filed in this case demonstrates that Lawrence acknowledged being provided with copies of the following records: the legal-mail policy (75-MAL-03), the food-service menus, the Aramark contract, the ODRC mission statement, the procedure for whitelisting an attorney, and the policy regarding access to the telephone and electronic mail (76-VIS-02). The parties agree that Lawrence was provided with these records on September 6, after he filed this mandamus action.

{¶ 20} By providing those records, ODRC fully satisfied the public-records requests Lawrence made in his June 19 kite to food services, his June 20 kite to the

mail room, his June 21 kite to the unit manager requesting the mission statement, and his June 21 request for the procedure for whitelisting an attorney. Additionally, Lawrence acknowledges in his merit brief that on September 6, he also received a record responsive to his June 21 request for a copy of the memo or directive regarding the decision prohibiting inmates from sending videos or pictures using their ViaPath tablets. Therefore, his mandamus claim is moot regarding those requests. *Brinkman*, 2024-Ohio-5063, at ¶ 25.

{¶ 21} In the same June 21 kite to the unit manager in which Lawrence inquired about whitelisting an attorney, he also requested "the policy regarding how to schedule Teleconference communications with an attorney here in Toledo." However, Lawrence does not argue in his merit brief that he is entitled to a writ of mandamus ordering ODRC to provide him with a copy of the teleconference policy. Therefore, Lawrence has abandoned his request for mandamus relief for that request. *See State ex rel. Ohio Gen. Assembly v. Brunner*, 2007-Ohio-3780, ¶ 26, fn. 4 (the court need not address a request for a writ of mandamus that was raised in a complaint but not specifically argued in the merit brief); *see also State ex rel. Tjaden v. Geauga Cty. Bd. of Elections*, 2024-Ohio-3396, ¶ 25, fn. 6 (concluding that an argument that is not developed or advanced in a party's merit brief is forfeited).

**B. Lawrence Has Abandoned Many of His Public-Records Requests**

{¶ 22} For Lawrence's remaining requests to ODRC staff members other than the warden's administrative assistant, the acknowledgment Lawrence signed does not indicate that he received records responsive to those requests. Nevertheless, Lawrence appears to acknowledge in his merit brief that he received the records requested in those kites. And he does not argue in his merit brief that he is entitled to a writ of mandamus ordering ODRC to produce those records. Therefore, Lawrence has abandoned his request for mandamus relief for the records he requested in his remaining kites to persons other than the warden's administrative assistant. *See Brunner* at ¶ 26, fn. 4; *Tjaden* at ¶ 25, fn. 6.

### C. Public-Records Requests to the Warden's Administrative Assistant

*1. June 19, 2024 kite requesting master file*

{¶ 23} Lawrence sent a kite to the warden's administrative assistant on June 19, requesting a copy of his master file. Although Clark initially responded that he would check on the request, the acknowledgment submitted as evidence by ODRC states that there is no master file at ToCI.

{¶ 24} Lawrence argues that his request for his master file was denied in contravention of controlling precedent, citing *State ex rel. Mobley v. Dept. of Rehab. & Corr.*, 2022-Ohio-1765. In that case, we held that some parts of an inmate's master file must be disclosed under the Public Records Act. *Id.* at ¶ 23-26.

{¶ 25} ODRC argues that it informed Lawrence a few weeks prior to his request, when it provided him with ToCI's inmate handbook during orientation, that he was not entitled to his own master file. ODRC also asserts that no master file exists at ToCI, and therefore it argues that *Mobley* does not apply. ODRC argues that a public office is required to produce only existing records.

{¶ 26} However, Lawrence requested a copy of his master file—not a copy of his master file that is kept at ToCI. ODRC has not submitted any evidence demonstrating that ODRC does not keep a master file for the inmates housed at ToCI. On the contrary, the statement in the ToCI inmate handbook that ODRC points to—informing inmates that they are not entitled to their master file—indicates that a master file exists. And ODRC has not cited any authority for the proposition that an inmate is restricted to requesting only files contained within the walls of the inmate's prison.

{¶ 27} Because ODRC's evidence indicates that a master file for Lawrence exists, we grant a limited writ of mandamus ordering ODRC to either (1) provide Lawrence with a copy of his master file and certify to this court the date that the master filed was provided or (2) certify to this court that ODRC itself is not in

possession of a master file for Lawrence. If ODRC provides Lawrence with a copy of his master file, ODRC may redact it as permitted by law.

*2. June 20, 2024 kite requesting correction officers' names and schedules*

{¶ 28} On June 20, Lawrence sent a kite to the warden's administrative assistant requesting the names of all correction officers employed by ToCI, a staff roster, and the schedule for the correction officers. Clark denied the request, stating that officer schedules "are not releasable per policy." Clark also stated that there is no available record that contains what Lawrence requested.

{¶ 29} Lawrence argues that a list of correction officers was held to be subject to production in *State ex rel. Patituce & Assocs., L.L.C. v. Cleveland*, 2017-Ohio-300 (8th Dist.). In that case, the Eighth District held that the city responded to a law firm's request for the personnel files of police officers within a reasonable time given that the city had to redact the files. *Id.* at ¶ 10.

{¶ 30} In response, ODRC argues that correction officers' work schedules and posts are security records under R.C. 149.433 and confidential law-enforcement information. Therefore, ODRC contends that it has no duty to produce schedules or post information. ODRC also argues that it has no duty to create the other records that Lawrence requested.

{¶ 31} "Exceptions to disclosure under the Public Records Act, R.C. 149.43, are strictly construed against the public-records custodian, and the custodian has the burden to establish" that "the requested records fall squarely within the exception." *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 2008-Ohio-1770, paragraph two of the syllabus.

{¶ 32} In support of its argument that correction officers' work schedules and posts are security records, ODRC cites *State ex rel. Slager v. Trelka*, 2024-Ohio-5125. In *Slager*, we held that lists of work schedules and work posts for correction officers were security records under R.C. 149.433(A) and thus exempt from release under R.C. 149.433(B)(1). *Id*. at ¶ 18-19.

{¶ 33} In this case, Lawrence's request for the work schedules of the correction officers at ToCI seeks records that fall squarely within the security-record exception, as recognized in *Slager*. And *Patituce* does not suggest otherwise because it concerned the release of personnel files of police officers. 2017-Ohio-300 at ¶ 2 (8th Dist.). Such records do not present the same security concerns as work schedules of correction officers. And to the extent that security concerns were present in *Patituce*, the Eighth District recognized that the city was required to redact that information. *Id.* at ¶ 8-10. In this case, ODRC properly withheld the requested work schedules as security records. Because the schedules were properly withheld as security records, we need not analyze whether they are also exempt from disclosure under R.C. 149.43(A) and (B) as confidential law enforcement investigatory records.

{¶ 34} With regard to his request for a staff roster, Lawrence argued in his merit brief only that he was entitled to a list of the names of correction officers. Accordingly, to the extent that Lawrence made a public-records request for the names of all staff members, he has abandoned his request for mandamus relief concerning it. *See Brunner*, 2007-Ohio-3780, at ¶ 26, fn. 4; *see also Tjaden*, 2024-Ohio-3396, at ¶ 25, fn. 6.

{¶ 35} As for Lawrence's request for a list of names of correction officers, ODRC denied this request because no available record contained the requested information. A public office does not have a duty to create new records to satisfy a public-records request. *State ex rel. White v. Goldsberry*, 1999-Ohio-447, ¶ 6. If the only record that is responsive to Lawrence's request for a list of correction officers is the work schedule that is exempt as a security record, then ODRC does not have a duty to create a separate list of the officers' names to provide a responsive record to Lawrence.

{¶ 36} Ultimately, the relator has the "burden to prove, by clear and convincing evidence, that the records [he] requested exist and are public records

maintained by the [public] office." *State ex rel. Cordell v. Paden*, 2019-Ohio-1216, ¶ 8. Lawrence has not submitted evidence indicating, nor has he argued, that some other list of correction officers exists apart from the properly withheld records.

{¶ 37} In sum, Lawrence is not entitled to mandamus relief regarding the public-records he requested in his June 20 kite to the warden's administrative assistant.

3. *July 11, 2024 kite requesting records related to Officer Gross*

{¶ 38} In a July 11 kite to the warden's administrative assistant, Lawrence requested a copy of Officer Gross's written conduct-report history from April 2024 to the present (July 11) and copies of disciplinary actions against Officer Gross and any findings or dispositions regarding those disciplinary actions. Burkhart responded, stating that the prison does not have a way to search for conduct reports written by Officer Gross. Burkhart did not respond to Lawrence's requests for disciplinary actions or findings or dispositions regarding any disciplinary actions.

{¶ 39} It is unclear whether Lawrence intended to request all conduct reports written by Officer Gross during that period or whether he was requesting that ODRC compile and disclose a list of the conduct reports. The parties themselves interpret the request differently in their arguments.

{¶ 40} Lawrence argues that ODRC was required to provide the conduct reports written by Officer Gross. ODRC argues that it had no obligation to create new records by searching for and compiling information from existing records. ODRC also contends that the public-information officer was unable to fulfill the request, because he could not search for records in the manner requested. ODRC thus argues that Lawrence was requesting that Burkhart compile a list.

{¶ 41} We interpret Lawrence's request for a copy of a "written conduct report history" as requesting a list of the conduct reports that Officer Gross wrote during the specified period, not as requesting the conduct reports Officer Gross wrote. As noted above, a public office does not have a duty to create new

documents to satisfy a public-records request. *White*, 1999-Ohio-447, at ¶ 6. Therefore, we deny Lawrence's request for mandamus relief for this public-records request.

{¶ 42} As for Lawrence's requests in the same kite for copies of disciplinary actions against Officer Gross and any findings or dispositions regarding those disciplinary actions, Lawrence did not request in his complaint that we order ODRC to produce those records. Even if his complaint is read as seeking mandamus relief for those records, he did not mention that relief in his merit brief. Therefore, he has abandoned any request for mandamus relief for those requests. *See Brunner*, 2007-Ohio-3780, at ¶ 26, fn. 4; *see also Tjaden*, 2024-Ohio-3396, at ¶ 25, fn. 6. Lawrence is not entitled to mandamus relief based on his July 11 kite to the warden's administrative assistant.

### D. Statutory Damages

{¶ 43} "Statutory damages accrue at the rate of $100 for each business day the office failed to meet one of R.C. 149.43(B)'s obligations, beginning on the day the requester files a mandamus action, up to $1,000." *State ex rel. Horton v. Kilbane*, 2022-Ohio-205, ¶ 15. As explained above, unless no master file for Lawrence exists in the possession of ODRC, ODRC improperly denied his request for his master file. If such a file does exist and ODRC has possession of it, then ODRC violated R.C. 149.43(B) and Lawrence may be entitled to statutory damages under R.C. 149.43(C).[2] Accordingly, we defer the determination of statutory damages until after ODRC has complied with the limited writ. *See State ex rel. Barr v. Wesson*, 2023-Ohio-3645, ¶ 18 (deferring determination of whether

---

2. The General Assembly has recently made amendments to R.C. 149.43, most notably in 2024 Sub.H.B. No. 265 (effective Apr. 9, 2025), and some provisions have been renumbered. This opinion applies the version of the statute enacted in 2023 Am.Sub.H.B. No. 33 (effective Oct. 3, 2023).

statutory damages were appropriate until after records custodian complied with limited writ).

### E. Court Costs

{¶ 44} Lawrence also requests an award of court costs. However, even if Lawrence were otherwise eligible for court costs, because he filed an affidavit of indigency, there are no court costs to award. *State ex rel. Straughter v. Dept. of Rehab. & Corr.*, 2023-Ohio-1543, ¶ 16. Therefore, we deny his request for court costs.

### III. CONCLUSION

{¶ 45} We grant a limited writ of mandamus ordering ODRC to, within 14 days, either (1) provide Lawrence with a copy of his master file and certify to this court the date the master file was provided or (2) certify to this court that ODRC itself is not in possession of a master file for Lawrence. ODRC may redact as permitted by law any record that it provides. We deny mandamus relief regarding Lawrence's other public-records requests, and we deny his request for court costs. We defer our ruling on Lawrence's request for statutory damages until ODRC has complied with the limited writ.

Limited writ granted.

_____

**KENNEDY, C.J., concurring in part and dissenting in part.**

{¶ 46} I agree with the majority opinion except its conclusion that the work schedule at issue is exempt as a security record and its conclusion that relator, Corrionne Lawrence, is entitled to statutory damages only if a master file exists and respondent, the Ohio Department of Rehabilitation and Correction, Operation Support Center ("ODRC"), has possession of it.

{¶ 47} In my view, ODRC failed to establish that a stale work schedule from June 20, 2024, containing correction officers' names meets the definition of "security record" under R.C. 149.433 and therefore failed to establish that the

schedule is exempt under Ohio's Public Records Act, R.C. 149.43. Consequently, in addition to the limited writ for the master file, I would order ODRC to either (1) provide Lawrence with the June 20, 2024, work schedule with correction officers' names or (2) certify to the court that such work schedule does not exist.

{¶ 48} Moreover, R.C. 149.43(C) permits an award of statutory damages for any violation of R.C. 149.43(B).[3] Therefore, I would defer any determination related to statutory damages, including whether ODRC violated R.C. 149.43(B)(1) when it failed to produce records responsive to Lawrence's other public-records requests—including those that are moot because ODRC provided the records after the mandamus action was filed—until after ODRC complies with the limited writ. Because the majority does otherwise, I concur in part and dissent in part.

### ODRC Failed to Establish that a Stale Work Schedule Containing Correction Officers' Names Is a Security Record

{¶ 49} Free access to public records—i.e., records that belong to the people of Ohio—promotes the policy "that open government serves the public interest and our democratic system," *State ex rel. Dann v. Taft*, 2006-Ohio-1825, ¶ 20. However, not all government records are public records. *See* R.C. 149.43(A). Security records are one example.

{¶ 50} "Security records" are records that "contain[] information directly used for protecting or maintaining the security of a public office against attack, interference, or sabotage." R.C. 149.433(A)(1). To qualify as a security record under that definition, it is not enough that possessing the information in a record might help someone attack, interfere with, or sabotage a public office; instead, security records are those records that "contain information *directly used* to protect

---

3. The General Assembly has recently made amendments to R.C. 149.43, most notably in 2024 Sub.H.B. No. 265 (effective Apr. 9, 2025), and some provisions have been renumbered. This opinion applies the version of the statute enacted in 2023 Am.Sub.H.B. No. 33 (effective Oct. 3, 2023).

and maintain the security of the public office from attack, interference, or sabotage." (Emphasis in original.) *Welsh-Huggins v. Jefferson Cty. Prosecutor's Office*, 2020-Ohio-5371, ¶ 82 (Kennedy, J., concurring in judgment only). Therefore, under R.C. 149.433(A)(1), "a record's status as a security record is determined by the public office's actual use of the information." *Id.* at ¶ 69.

{¶ 51} The public-records custodian bears the burden of establishing that a record is exempt from release under the Public Records Act. *State ex rel. Rogers v. Dept. of Rehab. & Corr.*, 2018-Ohio-5111, ¶ 7, 14. "And when a public office claims an exception based on risks that are not apparent within the records themselves, the office must provide more than conclusory statements in affidavits to support its claim." *Id.* at ¶ 15.

{¶ 52} This court concluded that the public-records custodian met that burden in *State ex rel. Cincinnati Enquirer v. Wilson*, 2024-Ohio-182. In *Wilson*, the Cincinnati Enquirer requested travel records for state troopers providing security for the governor to attend the Super Bowl. The evidence "show[ed] that the department use[d] information in the [travel] records to plan for the governor's security on a day-to-day and event-to-event basis." *Id.* at ¶ 29.

{¶ 53} I concurred in *Wilson* but authored a separate opinion clarifying that the affidavits submitted to establish the exception showed that the requested records did "contain information identifying the names and number of members of the governor's security personnel; dates, times, and sequencing of the governor's travel; and patterns related to the governor's security detail" and that the affiants "specifically explained . . . that th[e] information [would] be used 'when planning future trips with the Governor' and '[would] inform how the Governor's security personnel allocate[d] resources' for the governor's safety." *Id.* at ¶ 49 (Kennedy, C.J., concurring). Consequently, the affidavits proved that the security-records exception applied because they showed how the records were directly used to maintain the security of a public official.

16

{¶ 54} In contrast, in *Rogers*, this court concluded that ODRC did not prove that a prison's surveillance-video footage was exempt from disclosure as a security record. 2018-Ohio-5111 at ¶ 21. In reaching its decision, the court held that ODRC did not show how the requested video footage fit "squarely within the exception," *id.*, because ODRC supported its claim solely with conclusory statements, *id.* at ¶ 19. In fact, it did "not offer[] any analysis" explaining why the exception applied. *Id.* at ¶ 21. This court suggested that ODRC could have provided evidence showing that the video footage was "being used in a current investigation regarding the incident depicted in it" or that the video disclosed "current security response plans or other protocols," but ODRC had failed to do so. *Id.*

{¶ 55} As in *Rogers*, the affidavit testimony here does not explain how a work schedule from June 20, 2024, containing the names of correction officers is being used. The affiant merely makes conclusory statements that producing the stale work schedule would pose a safety risk to the prison. As Derek Burkhart, the warden's administrative assistant, averred:

> Confidential law enforcement information, including the names of all corrections officers and their work schedules is exempt from the Ohio Public Records Act as disclosure of the same would create a high probability that disclosure of the information would endanger the life or physical safety of said law enforcement personnel as the information can be used to achieve nefarious ends. By having access to who is working, how many persons are on each shift, how many persons are assigned to each cell block, when vacations or staff shortages may be occurring, inmates can utilize the same to target individual officers, plan fights and riots, plan the distribution of contraband, and/or otherwise plan the best time to violate prison protocols. *State ex rel. Cleveland Police Patrolmen's Association*

*v. City of Cleveland*, 122 Ohio App.3d 696, 700 (1997) [8th Dist.]. Further, said disclosure would create a high probability that the information would negatively affect the security of the prison by opening the prison to attack, interference, and sabotage. No further information was provided to Mr. Lawrence.

**{¶ 56}** As stated above, the burden is on ODRC to prove that the stale work schedule containing correction officers' names "fits squarely" under the security-records exception. But it failed to meet that burden with Burkhart's affidavit.

**{¶ 57}** Like the evidence presented in *Rogers*, the evidence presented by ODRC in this case does not explain how the record requested, here, a work-schedule containing the names of correction officers from June 20, 2024, "contains information *directly used* for protecting or maintaining the security of a public office against attack, interference, or sabotage" (emphasis added), R.C. 149.433(A)(1). Because ODRC does not specifically state how an old work schedule is currently and directly used to maintain the security of Toledo Correctional Institution or to prevent attacks, interference, or sabotage of a public office, it has not shown that the requested record meets the definition of "security record." For all we know, the outdated work schedule that Lawrence requested, if it exists, may have been sitting untouched in a drawer collecting dust for more than a year and a half. ODRC has not submitted any proof that the requested records are used at all—for any purpose. *See State ex rel. Slager v. Trelka*, 2024-Ohio-5125, ¶ 43-44 (Kennedy, C.J., concurring in part and dissenting in part) (outlining a similar case in which there was "no proof that anyone ha[d] even touched" the requested work-schedule assignments since before the mandamus complaint was filed).

**{¶ 58}** "The General Assembly has not crafted an exception to the release of a record based on the custodian's subjective view that the information that the

record contains could be dangerous if placed in the wrong hands." *Welsh-Huggins*, 2020-Ohio-5371, at ¶ 85 (Kennedy, J., concurring in judgment only). Maybe it should. But for now, a public-records custodian seeking to establish the applicability of the security-records exception must prove not only that the requested record contains information that is used to prevent threats to a public office but also that the information in the requested record is currently and directly used for security purposes. Because ODRC has failed to make that showing here, the security-records exception does not apply.

{¶ 59} Therefore, in addition to the limited writ for the master file, I would order ODRC to either (1) provide Lawrence with the June 20, 2024, work schedule containing correction officers' names or (2) certify to the court that such work schedule does not exist.

**Statutory Damages**

{¶ 60} In resolving some of the public-records requests as moot because Lawrence acknowledges that ODRC produced those records after the mandamus action was filed, the court does not indicate that it is deferring a determination of any statutory damages for these records until *after* ODRC complies with the limited writ. Accordingly, I conclude that the court is denying statutory damages for these records by silence.

{¶ 61} This conclusion is supported by the majority opinion's language announcing the court's deferment of statutory damages for the master file: "As explained above, unless no master file for Lawrence exists in the possession of ODRC, ODRC improperly denied [Lawrence's] request for his master file. If such a file does exist and ODRC has possession of it, then ODRC violated R.C. 149.43(B) and Lawrence may be entitled to statutory damages under R.C. 149.43(C)."

**{¶ 62}** I would defer the determination of statutory damages for *all* of Lawerence's public-records requests until after ODRC has complied with the court's limited writ.

**{¶ 63}** For the foregoing reasons, I concur in part and dissent in part.

_____

Corrionne Lawrence, pro se.

Dave Yost, Attorney General, and Marcy A. Vonderwell and B. Alexander Kennedy, Assistant Attorneys General, for respondent.

_____